The opinion of the Court was afterwards delivered as follows, by
Parsons, C. J.
This cause is submitted to the decision of the Court upon a case agreed by the parties. Thompson Baxter, the plaintiff, has sued Daniel Taber, as surety in a bond, in which Thomas Holbrook, Jr. was principal, given to the plaintiff, to be forfeited, if Holbrook, who was committed to the jail in Portland, on execution at the plaintiff’s suit, did not continue a true prisoner within that prison, until lawfully discharged.
It is necessary to decide what privileges Holbrook acquired by virtue of this bond ; and whether, from the facts agreed, he had unlawfully exceeded those privileges.
* By several provincial statutes it was made the duty [ * 364] of the Courts of Sessions to erect a prison in their respective counties, containing apartments within it to lock up debtors separate from felons and other criminals ; to provide apartments be longing to the prison, in which debtors, who had given bonds to inoemnify their creditors against escapes, might have chambers at a small weekly rent; and a yard appurtenant to the prison, the liber ty of which, debtors, who had given this indemnity, might be al *320 lowed in the day-time. All these apartments, whether in or belonging to the prison, and the yard appurtenant, were a part of the prison. The sheriff had the custody of the prison, by himself, or by a jailer, his deputy, whose duty it was to lock up criminals in some safe apartment in the prison ; and also debtors, who had not given the bond of indemnity ; but apart from criminals. And to debtors, who had given this bond, he was obliged to allow chambers Delonging to the prison; and he could not lawfully restrain them from the liberty of the yard in the day-time, as this privilege was secured to them by statute. As the Sessions were authorized to provide a yard appurtenant to the prison for the ease of debtors, to accommodate them with air and exercise, the Sessions must neces sarily have power to ascertain its boundaries, without any express directions given for that purpose.
These several provisions were reenacted by the statutes of 1783, c. 44, and 1784, c. 41. There cannot be any doubt that the yard is a part of the prison ; for the ninth section of this last act allows t« debtors the liberty of the yard, but not to pass without the limits of the prison ; and a part of the condition of the bond, given by a debtor to obtain the liberty of the yard in the day-time, is, that the debtor shall continue a true prisoner, in the custody of the jailer, within the limits of the prison.
Previous to the passing of this last act, no doubts had been entertained as to the liberty of the jail-yard. The Sessions had never attempted to make any land a part of the yard, but their own land, or land over which they had some control; but a power in the Sessions to make the closes or houses of others a part of the yard appurtenant to the county jail, which the Sessions were to [ * 365 ] provide, was, I believe, never * conceived to belong to that court. At the close of the ninth section, it is made the duty of that court to fix and determine the boundaries of the several jail-yards to the several jails appertaining, as soon as might be after the publication of that act. By this clause no new power is given to the Court of Sessions. Before this time, it might fix the boundaries of the jail-yard ; and as the county might own more land, adjoining on the prison, than might be thought necessary for a yard, and which it might be convenient to appropriate to some other use, doubts as to the limits of the yard might exist, which the Sessions were enjoined seasonably to remove by ascertaining those limits.
But it is urged that, by virtue 'of this clause, the Sessions may extend the limits of the jail-yard, at its pleasure, Including within its limits a whole town, and making every man’s house and land a part of the prison, of which the sheriff has the custody. And the boundaries of the Portland jail, as fixed by the order of the Sessions, *321 which is a part of the case, affords some presumption that the Court of Sessions for Cumberland, in the year 1798, were of this opinion.
We are, however, satisfied that no opinion could have less foundation. This last act gives, in this respect, no new powers ; and the practice, for half a century, under the former laws, is irresistible evidence of the construction of the power in the Sessions to fix the limits of the prison. Now, in virtue of this power, it is said that every man’s house, and garden, and close, in Portland, is made a part of the county jail, of which by law the sheriff has the custody, by being made a part of the yard appurtenant to the prison. To give a power of this extent to the Sessions, could not have been within the intent of the statute ; and if the legislature had intended it, it is manifest that the execution of the power would have been unconstitutional, as it w'ould have been an appropriation of private property to public uses without compensation to the proprietors, (a)
Neither can this power he considered as analogous to the jurisdiction of the King’s Bench in fixing the boundaries of the rules of their prison. That court may order their prison to be located at its pleasure; and because the prison is * not [ * 366 ] large enough to contain all the prisoners, the court have authorized the marshal to keep his debtors within certain limits, without the walls of the prison, ascertained by a rule of the court, and hence called the rules of the prison. It remains at the discretion of the marshal, how far he will grant this permission to debtors ; for he is still answerable to the creditor for an escape from the rules. And having granted this permission, he may revoke it, and lock up his prisoner, if there should be danger of an escape; or if he escape against the will of the marshal, he may retake him on fresh pursuit. And on granting permission, he may take bonds from the debtor, conditioned that he shall be a true prisoner; which are held good, and not as given for ease and favor. But the rules of the prison are not stated or considered as a jail-yard appurtenant to the prison, which debtors are allowed on any terms to have, against the will of the marshal.
The law in this state is very different. The prison, including all the apartments and appurtenances, is provided at the expense of the county, which is answerable for all escapes of debtors through the insufficiency of the jail, the justices in Sessions being for this purpose the agents for the county, as well in raising as in appropriating the money. And the Sessions only have authority to locate and erect the prison, and limit its boundaries, without the control of a ay other court. And as the jail-yard, to be provided for the *322 accommodation of debtors, must be not only a part of, but appurtenant to the prison, it is unreasonable to consider the enclosure or the dwelling-house of any man as part of a yard appurtenant to a jail; which must be considered to be some open area, which the debtor may lawfully enter in the day-time.
But this extravagant construction of the powers of the Sessions may perhaps be contended for, as beneficial and humane to debtors. The genius of our laws is certainly humane to debtors; perhaps without sufficiently distinguishing between debtors in execution for breach of contracts, and those who have been convicted of personal torts. The design of the statute, in this case, is to grant them relief from close confinement, that they may preserve their health by using exercise and fresh air, without giving indulgences, [ * 367 ] which should * induce an able but fraudulent debtor to withhold from his creditor a just debt. If the debtor alleges that he is unable to pay-, and will satisfy two justices of the peace, by his examination on oath, of the truth of his allegations, he will be discharged ; and this discharge may generally be effected in thirty days. But if able to pay his debts, it is not an unreasonable hardship, that he should be coerced by confinement to apartments belonging to the prison, with a liberty of the yard appurtenant, for air and exercise.
There is another consideration which has great weight in our minds. Imprisonment for debt ought to be exercised impartially; but on the construction contended for, many great advantages are secured to a debtor who lives in the town where a county jail is erected. If this construction should prevail, a debtor in Portland, when in execution, after he has given bonds, is subject to no other restraint than keeping in some hired apartment belonging to the prison, during the night; but in the day he may live with his family, and pursue his business, or amusements, at his pleasure, either on land or water, so that he does not leave the town, or go on the islands; for it should seem that the waters of the harbor within the town are, by the magic of this power, transferred to a part of the jail-yard.
But it has been argued that, admitting the Court of Sessions has exceeded its power, yet the order must be effectual according to the terms of it, until it is rescinded on certiorari. We greatly doubt whether in this case a certiorari could lawfully be issued. This order of the Sessions does not appear to be a judicial act, but done in execution of the powers vested in the justices by law, as ministerial agents for the county; like the powers they have to purchase lands, and to erect court-houses, jails, and houses of correction, for the use of the county; or to make contracts in behalf of the county • *323 allow accounts, and issue orders for payment. But if a certiorari lies, yet it is very clear that when it appears on the face of an order of Sessions, made in execution of powers like these, that no powers exist for passing the order, it must be deemed ipso facto void, so far as it is founded on an excess of legal powers. But it may be good so far as the * powers of the Sessions ex- [* 368 ] tend, whether they have been used discreetly or otherwise.
We fear that the powers on this subject, which the Sessions sup posed they possessed, and the manner in which they may have been exercised, may have ensnared some persons, confiding that the legal powers had not been exceeded. We shall greatly regret this effect; but we cannot prevent it. Inconveniences to individuals cannot alter the law, nor bend it to particular cases. We must execute it impartially, and dispense the same measure of justice to all the citizens, uninfluenced by their rank, station, or circumstances. Few, if any, creditors will probably avail themselves of any mistake to charge a humane surety; and certainly not he who lives
“Beyond the fixed and settled rules Of vice and virtue in the schools, Beyond the letter of the law.”
As we cannot construe the powers of the Sessions as coc-xtensive with the terms of the order, we shall consider what liberty may be lawfully allowed under it to a debtor in execution. And we are of opinion that the debtor’s liberty extends to all the grounds, the property of the county, appurtenant to the prison; and further, as the public streets and highways are open to all the citizens; as any man, without being a trespasser, may use them as well for air and exercise as for other purposes, — we do not feel ourselves obliged to restrain the Sessions from considering them, when adjoining on, or leading to the prison, as part of the jail-yard ; for, in fact, when the public necessity or convenience requires it, a highway may be located by the Sessions over the yard. But further than this we cannot go. We cannot admit that the Sessions can, by any order of theirs, make the private property of others, of which by law they have the exclusive use, a part of the county prison.
Having thus given, as we conceive, the most liberal limits of the yard, within which a debtor must be restrained, which the law allows, we shall now examine the facts in the case, to determine whether Holbrook:, the debtor, did or did not escape without those limits. The case seems to have been hastily drawn up, and without much precision; and we must form * as cor- [ * 369 ] rect a statement of the facts as we are able. It is stated *324 that after the execution of the bond, Holbrook was accustomed to go to and frequent any part of Portland, in the day-time, within the limits ascertained by the order. From this statement we cannot conclude that he in fact went to any part of the town, to which he might not lawfully go. He might not leave the public streets, or invade the private property of any man ; and we cannot necessarily infer that he has broken the condition of the bond. It is further stated that, being at a place called King Street, which we may presume is a public street in Portland, he was suddenly taken sick, and was necessarily conveyed to a private house, where he languished until he died, as he could not be removed to the prison, without manifest danger of his life. From the liberty we have supposed debtors in execution entitled to under the order of the Sessions, we cannot consider Holbrook's being in King Street as an escape. Had he voluntarily left the street, and entered the private house, it is our opinion that it would have been an escape.
But was the conveying of him to this house by others, in consequence of his sudden sickness, a breach of the condition ? After the fullest consideration we have been able to give this question, we are satisfied that, to constitute an escape, within the intent of this bond, there must be some agency of the debtor employed ; and a conveying of him without the limits of the prison, he not consenting, is no escape, if he return as soon as he has the ability.
If any force, not of an enemy, should break open a jail, and a prisoner, availing himself of the breach, should leave the prison, or suffer himself to be rescued, it would be an escape. But if he was carried away by violence, and voluntarily returned as soon as the force ceased, it is not clear that at law it would be considered as an escape. And if a debtor who had entitled himself to the liberty of the yard by giving bond, should be forcibly carried without the limits, and should return as soon as the force ceased, perhaps it might not be a breach within the true intent of the bond. ■ If he is visited by sudden sickness, so extreme that he is carried [ * 370 ] to an adjoining * house, without any agency or direction of his own, but by the humanity of others, we are satisfied that this would be no escape, if he returned as soon as he had reason and strength; and if he died before, the bond would be saved ; for it happened by the providence of God, which shall hurt no man. ■ This is the case before us. Holbrook, while lawfully in the street, was suddenly visited with extreme sickness, which made it necessary to carry him to a private house. There he languished until he died, as a return to the prison would manifestly have endangered his life.
It is our opinion that this was not an escape within the true in *325 tent of the condition of the bond. According to the agreement of the parties, the plaintiff must be called.

Plaintiff nonsuit.

 [Walter vs. Bacon, 8 Mass. Rep. 468. — Ed.]