## CODMAN *vs.* LOWELL & AL.

Under *Stat.* 1822, *ch.* 209, the Court of Sessions may lawfully extend the debtors' limits to the exterior bounds of the county.

And the sheriff has no control over the body of a debtor, after he has given bond for the liberty of the yard, except in the cases specified in that statute.

The Justices of the Sessions, in fixing the prison limits, perform a ministerial office only ; in which any peculiar benefit thereby derived to one of them, does not disqualify him to act.

*Debt* on a bond dated *Oct.* 28, 1822, conditioned that the defendant *Lowell,* who was a debtor committed in execution, should " continue a true prisoner within the limits of the gaol-yard, until " he shall be lawfully discharged, and shall not depart without " the exterior bounds of said gaol-yard, until lawfully discharged " from said imprisonment, and commit no manner of escape."

The defendants, after oyer, pleaded generally a performance of the condition ;—to which the plaintiff replied that the debtor, " at a place called *Standish,*" in this county, " departed without " the exterior bounds of said gaol-yard, as the same were then " fixed and established by law ;—which was traversed, and issue joined thereon.

The extent and limits of the gaol-yard, or debtors' liberties, was the only subject in controversy in this cause.

By an order of the Court of Sessions passed in *Oct.* 1798, and confirmed by subsequent statutes, these limits were established to include the town of *Portland* only, exclusive of the islands.

This order was founded on *Stat.* 1784, *ch.* 41, providing that " the Court of General Sessions of the peace shall fix and deter- " mine the boundaries of the gaol-yards to the several gaols " appertaining, in their respective counties, as soon as may be " after the publication of this act."

By the *Stat.* 1822, *ch.* 209, which is a revision of the laws relative to poor debtors, the Courts of Sessions are authorized " to " fix and determine the boundaries of the gaol-yards to the sever- " al gaols in their respective counties, and the same to change " and alter from time to time as to them shall appear proper."

Under the authority of this last act the Court of Sessions of this county, consisting of five Justices, by an order in *September* 1822, enlarged and fixed the prison limits, so as to " extend over " the whole territory within the county, and to the exterior limits " thereof." Against this order two of the Justices dissented, and entered their dissent on the record of their Court.

At the trial of this cause in the Court below, before *Whitman C. J.* the plaintiff offered to prove that Justice *Hasty* of *Scarborough*, one of the three Justices who made the last order, was at that time a prisoner within the debtors' limits, and had a direct interest in passing the order, to effect his own enlargement ;— which evidence the Judge refused to admit. The plaintiff further objected that the Court of Sessions, in making the order, had transcended their constitutional powers ;—but the Judge overruled this objection, and directed a nonsuit, to which the plaintiff excepted, pursuant to the statute.

*Longfellow*, for the plaintiff, insisted that the order of 1822, was in truth the act of two Justices only, and therefore of no force ; Justice *Hasty* being directly interested, and so disqualified to act in the case. And he cited *Baxter v. Taber* 4 *Mass.* 361, to shew that the Justices, in making the order, exercised an office purely ministerial, and which might therefore be examined in this collateral manner. But he further contended that the order was an assumption of powers not conferred by the constitution. Its effect would be to give the sheriff a paramount authority over every man's freehold in the county, constituting it a part of the prison ; and thus taking the property of the citizen for public uses, without compensation.

*Adams*, for the defendants, replied that if Justice *Hasty* had been interested in the subject of the prison limits, the argument from that fact would prove too much ;—for the act of deciding in that case would be a misfeasance deserving impeachment ; and the conduct and motives of a respectable magistrate ought not to be tried and adjudicated upon in this manner, without the possibility of hearing his defence.——And he denied that a debtor committed any escape by entering upon private property within the

limits ; or that the authority of the sheriff over such property was in any respect enlarged, by including it within the debtors' liberties.

After this argument, which was had at May term 1823, the cause being continued for advisement, the opinion of the Court was delivered at the *August* term, 1824, in *Oxford,* by

MELLEN, C. J. In support of the exceptions taken to the opinions and judgment of the Court below, two objections have been urged by the counsel for the plaintiff ; viz.—1. That when the supposed order of the Court of Sessions, extending the limits of the prison to the exterior limits of the county, was passed, two of the Justices of said Court (which consists of five) opposed and protested against it ; and a third, as the plaintiff offered to prove, was disqualified to sit and give an opinion on the question, for the reason assigned in the exception ; and that therefore no order was passed ; there being on that occasion no competent Court to pass it ;—and 2. That even if the Court had been unanimous in passing the same, it is void, for want of legal authority in the Court of Sessions to pass such an order.

1. As to the first objection.—Was the proof which was offered to shew the imprisonment of *William Hasty,* one of the Justices of said Court, at the time the supposed order was passed, properly rejected ? If the Justices of the Court of Sessions are to be considered, when fixing and determining the boundaries of gaol yards, as acting in a judicial capacity, and the order is to be considered a judicial act ; then it seems to be conceded that it cannot be impeached on account of the reason assigned. It would certainly be dangerous to declare a judgment of Court void, because the Judges who rendered it acted from corrupt motives in making their decision. On proof of such a charge they might be punished by removal from office ; but the merits of the judgment could not be affected by the offence of the Judges. Aware of this principle, the plaintiff's counsel contends that such an order of the Court of Sessions is not a judicial, but merely a ministerial act ; and that the Justices, in passing such an order, are only executing the powers vested in them by law as ministerial agents of the county ; in the same manner as when they purchase lands,

erect court houses and gaols, make contracts, allow accounts, &c. on behalf of the county; according to the opinion of the Court in *Baxter v. Taber* 4 *Mass.* 361.—This argument seems to prove too much, because it is no objection to an agent that he has a personal interest in the act he performs in virtue of the power given him. If three of the Justices of the Court of Sessions were owners of a lot of ground suitable to erect a gaol upon; would there be any illegality or impropriety, should the Court purchase it for the use of the County ? and if they should purchase it, would the sale be void, because the three Justices who owned the land, and sold it in their private capacity, had an interest in the sale, and a strong inclination for it ? Cannot the Court of Sessions allow and certify their own accounts, for their own attendance and travel ? Is it any disqualification of a Justice of the Court of Sessions that he has the strongest desire that a particular road should be laid out, which will give him peculiar and great facilities ? Can he not legally join his brethren on the bench in causing such a road to be laid out, provided he has no direct pecuniary interest in the case ? We do not perceive that there was any thing erroneous in the opinion of the Court of Common Pleas in rejecting the proof offered with a view of shewing the disqualification of *William Hasty* to act in passing the order in question.

In support of the second objection, the plaintiff's counsel relies upon the decision in the case of *Baxter v. Taber* above mentioned. The order of the Court of Sessions, the validity of which was then under consideration, was passed under the supposed authority of the *Stat.* 1784, *ch.* 41. At the time of that decision the language of the condition of the bond given by a debtor, imprisoned on execution, to obtain the liberty of the yard, was different from the condition of such a bond as now by law established. A part of the condition of the bond required, prior to the 29th of *February*, 1812, was that the debtor should continue a true prisoner in the custody of the gaoler within the limits of the prison. But by the act of *February* 29th 1812, the condition of such bond is required to be, that such prisoner will not depart without the exterior bounds of the debtors' liberties, until lawfully discharged.—Much of the reasoning of *Parsons C. J.* in the case of *Baxter v. Taber*, is founded on the language of the act of 1784, both in relation to the nature

of a gaol yard, and the nature and extent of the liberties intended to be granted to poor debtors, who should give the bond required. And from this peculiarity of language he seems to draw many of his conclusions respecting the power delegated to the then Court of General Sessions of the Peace, as to fixing and determining the boundaries of gaol yards. If the laws upon this subject had then been as they are now, we apprehend a different course of reasoning would have been pursued, and that it would have led to a different result. In the act of 1822, instead of the words " Debtors' liberties," the words " gaol yard" are used;—in the act of *Massachusetts, June 26th,* 1811, the words of the condition of such a bond are required to be " the exterior bounds of the gaol yard or debtors' liberties." Both expressions seem to have been considered as synonymous.—Again, in the above case the Chief Justice says,—" There cannot be a doubt that the yard is a part " of the prison; for the ninth section of the last act, meaning the " act of 1784, allows to debtors the liberty of the yard, but not " to pass without the limits of the prison." As the act of 1822, above cited contains none of this ambiguous language; alludes to no confinement to the limits of the prison; nor the debtor's continuance as a true prisoner, in the custody of the gaoler; and as the language is general, which is employed in the grant of power to the Court of Sessions to fix and determine the boundaries of gaol yards, and change and alter them from time to time as to them may seem proper; we are led to the conclusion that the decision in *Baxter v. Taber,* so far from having settled the question depending in this cause, cannot be considered as in any essential particular resembling it. And even if it be conceded that the decision in that case rests on sound principles of construction according to the laws then in existence, it cannot be viewed as having any important influence on the decision of the case before us, depending on laws of a very different character; evidently indicating an intention to grant greater indulgence than formerly to the debtor, and to extend the liberties of the yard beyond the line which the Court in the above case considered as bounding them.

Independently, then, of authorities, what are the objections to the defence which has been made, and the decision of the Court

below ? It is urged that it is impolitic to sanction the order of the Court of Sessions. The answer is, the legislature has given to that Court the power to fix the boundaries as to them may seem proper. *They* have the discretionary power, not this Court. And though we may be of opinion, that the order in question shews an unusual and extraordinary exercise of this discretionary power, it by no means follows that this Court is bound or authorized to pronounce it illegal and void on that account. The language of the statute by which the authority to establish the limits of the gaol yard to the several gaols in the State is given is as general as that by which the power is given to the Court of Sessions to 'lay out and establish highways. That Court may abuse that power by laying out roads which are wholly unnecessary and unreasonable, and burthensome to those who are bound to make and repair them. The Court in this county for instance, have power to lay out a new highway from this town to Bowdoin College, parallel to and forty rods distant from the present county road. Now supposing they should do this, has this Court power to pronounce the adjudication as to expediency, and the location of the road, void, and refuse to sustain an indictment against any town through which the road passed, for neglecting to repair it ? It is evident that a great change has taken place in public opinion on the subject of imprisonment for debt; and a disposition is becoming more and more manifest, if not to abolish it, at least to render it as little irksome as possible; in fact, to render it scarcely a privation of liberty. In proof of this we might mention among other things, the recent statute of this State in relation to imprisonment for debt on execution. But without indicating any idea of our own as to the wisdom and policy of legislating in conformity to these opinions; still, considering their existence, and increasing prevalence; and considering also the difficulties and doubts which attend the construction of the statute relating to the powers of the Court of Sessions, as contended for by the counsel for the plaintiff ;—the present case seems to be a proper one, in which to look to the consequences of the decision of the Court; one of which will be, the unexpected prosecution, liability and suffering, of hundreds of innocent sureties on prison bonds, who may be

Codman *v.* Lowell & al.

involved in ruin in consequence of those acts of their principals, which have been almost universally deemed lawful. In common cases, where the principles of law are clear and settled, the Court ought never so far to regard consequences as to hesitate in pronouncing the law distinctly ; but, on the contrary, where doubt and uncertainty attend the construction of a statute, and the application of a new principle may disturb titles, or impair rights, create dangerous responsibilities, or produce consequences extensively injurious, the more safe and proper course seems to be, for a Court to incline to that decision which will sanction proceedings and contracts as they were understood and intended when made or adopted, and be least prejudicial to the community. Should the legislature be of opinion that, in any of the counties, the Court of Sessions has given too broad a construction of their discretionary powers, in relation to the establishment of the boundaries of gaol yards, they can easily correct the evil, and introduce something like uniformity upon the subject, by declaring by law that the gaol yard shall not, in any county, be so established as to contain more than a certain number of acres or rods. But this is a subject over which this Court has no control; and with which of course, it will not interfere.

But it has been urged that if the above mentioned order of the Court of Sessions should be sanctioned, every man's house in the county is at once placed under the supervision and command of the Sheriff; who may at all hours enter it according to his will and pleasure. This is not true. He has no such power. If a prisoner shall have escaped from prison or from actual custody, and concealed himself in another man's house in the county, the Sheriff may enter the house to retake him; because the owner of the house cannot make it a *castle for others*; though the law for certain purposes considers it as his own castle. But the Sheriff would have the same right of recaption in the cases above stated if the limits of the gaol yard included only the land belonging to the county and adjoining the prison. If a person has given bond according to laws in force in this state, and obtained the liberty of the yard, the Sheriff has no kind of control over his person, except what is given by the *Stat.* 1822, *ch.* 209 ; he cannot touch him, and of course he cannot pursue him into the houses or

possessions of any persons in this county ; neither does the debtor, after having given bond according to law, and obtained the liberty of the yard, acquire thereby any right as against third persons. He cannot thereby gain a right to go into the house of any man, without his express or implied permission. If he should, he will be a trespasser. The act of 1822 only provides in the eighth section, " that nothing shall be considered a breach of any bond " which has been or may be given to obtain the liberty of the gaol " yard, except the passing over and beyond the exterior limits and " bounds thereof, as by law established, or neglecting to surren- " der himself to the gaol keeper as required in the 25th section " of this act." Thus all the anticipated danger to the property, liberty, and independence of the citizens in the county vanishes in a moment.

Without dwelling any longer upon the cause, we are satisfied, that the opinions and judgment of the Court of Common Pleas to which the exception was filed, are correct; and accordingly the

*Judgment is affirmed.*