### Case No. 15,539.

UNITED STATES v. KNIGHT et al.

[3 Sumn. 358: [1] 1 Law Rep. 257.]

Circuit Court, D. Maine.    Oct. Term, 1838.[2]

IMPRISONMENT FOR DEBT — ADOPTION OF STATE LAWS—GOAL LIBERTIES—ESCAPE.

1. The act of congress of 1800, c. 4 [2 Stat. 4], is not that, by which the liberties of the gaol yards allowed to debtors imprisoned on execution issuing from the courts of the United States are now regulated.

2. The act of 1828, c. 68 [4 Stat. 278], has adopted the state laws on the subject of gaol liberties, then existing in the states, under the words of the third section, which declare, "that writs of execution and other final process issued on judgments and decrees rendered in any of the courts of the United States, and the proceedings thereupon shall be the same, &c., as are now used in the courts of such state," &c., &c.

[Cited in Hathaway v. Roach, Case No. 6,213; Re Freeman, Id. 5,038; Campbell v. Hadley, Id. 2,358.]

3. Quære, whether, at the common law, it is an escape of a debtor imprisoned on execution, for the sheriff to allow him the liberties of the gaol yard; or whether the sheriff is bound to keep him in salvā et arctā custodiā within the walls of the gaol itself?

[1] [Reported by Charles Sumner, Esq.]
[2] [Affirmed in 14 Pet. (39 U. S.) 301.]

This was an action brought on the 15th day of September, 1838, on a bond given to the United States on the 30th day of January, 1838, for the liberties in the gaol yard in Portland, in Maine district. Plea, the general issue, with liberty to give special matter in evidence. The condition of the bond, after reciting, that Jacob Knight and Benjamin Knight have been, and now are, imprisoned in the prison in Portland, in Maine district, by virtue of an execution issued against them, on a judgment obtained against them by the United States, at the district court, &c., for the sum of $8,462.36 principal, and $61.79 for interest, &c., and costs of suit taxed at, &c., proceeds as follows; "Now if the said Jacob Knight and Benjamin Knight, from the time of executing this bond, shall continue true prisoners in the custody of the gaoler, within the limits of the gaol yard, until they shall be lawfully discharged, and shall not depart without the exterior bounds of said gaol yard, until lawfully discharged from said imprisonment according to the laws of the United States in such cases made and provided, and commit no manner of escape, then the said obligation shall be void; otherwise to remain in full force."

The parties agreed upon a statement of facts as follows: "On the 30th day of January last past (1838), the said Jacob and Benjamin were committed to the gaol in the city of Portland on an execution, issued on a judgment in favor of the said United States against said Jacob and Benjamin, whereupon the said Jacob and Benjamin as principals, and the said Isaac and Edward, as sureties, gave the bond declared on in this suit. That said Jacob and Benjamin continued to remain within the limits of the town of Portland, exclusive of the islands, and did not depart therefrom up to the time of the commencement of this suit, nor have they since departed therefrom; but neither the said Jacob or Benjamin, from the time of the execution of said bond, nor afterwards, at any time, lodged in the night time within the walls of said gaol, but remained at large within the limits of said town of Portland, exclusive of the islands belonging to the same, both day and night. If, upon the foregoing facts, the court are of opinion that the condition of said bond has been broken by the said Jacob and Benjamin, and that they have made an escape, then the said court are to render judgment, to be entered as of said October term, and as on a verdict rendered for the said United States. And if the court be of opinion, that the obligation of said bond has not been broken, then judgment to be rendered in manner aforesaid for the said defendants. And each party reserve to themselves the right to a writ of error to reverse any such judgment as may as aforesaid be rendered by said court in the case. A copy of the records of the court of sessions for the county

of Cumberland, hereunto annexed, may be referred to as a part of the facts of this case."

To this statement was annexed the following document:

"At a court of general sessions of the peace, for the county of Cumberland, begun and holden at Portland, in said county, on the last Tuesday of May, A. D. 1787, being the 29th day. of said month [justices present: Enoch Freeman, Esq., William Thompson, Esq., John Lewis, Esq., Edmund Phinney, Esq., Robert Southgate, Esq., John Frothingham, Esq., Isaac Parsons, Esq., William Gorham, Esq., George Pierce, Esq., David Mitchell, Esq., Samuel Freeman, Esq., Richard Codman, Esq., Samuel Small, Esq., Daniel Davis, Esq., Joshua Fabyan, Esq., John Dean, Esq., Peter Noyes, Esq.],[3] the court took into consideration the establishment of proper boundaries of the gaol yard in said county, and determined the same as follows. viz.: Beginning at the bottom of Love lane at low-water mark, thence up said lane, including the houses on each side thereof, to the northerly side of Back street, thence down said Back street, including the houses on both sides thereof, to King street, from thence down said King street, including the houses on both sides thereof, to low-water mark, thence by low-water mark to the first bounds, including all the grounds and buildings within the aforesaid limits.

"At a court of general sessions of the peace, for the county of Cumberland, begun and holden at Portland, in said county, on the third Tuesday of October, being the 16th day of said month, A. D. 1798 [present the following justices, viz.: William Thompson, William Gorham, John Lewis, Isaac Parsons, Robert Southgate, Josiah Thatcher, Samuel Merrill, Benjamin Dunning, William Widgery, Paul Little, Ichabod Bonney, Josiah Pierce, Andrew Dunning, George Lewis, Peter T. Smith, John Greenwood, William Martin, Stephen Longfellow, Samuel P. Russell, Ammi R. Mitchell, Stephen Purrington, John Dean, Enoch Perley, Elisha Williams],[3] the committee, appointed to consider suitable limits for the gaol yard, report, as their opinion, that the limits or bounds of the town of Portland, exclusive of the islands, be fixed and determined as the boundaries of said gaol yard. Their report is accepted, and the said limits fixed and determined as the bounds of said gaol yard accordingly

"Recorded by Samuel Freeman, Clerk.

"At a court of sessions, begun and holden at Portland, in and for the county of Cumberland, on the second Tuesday of September, being the 10th day of said month, A. D. 1822 [justices present: Hon. Woodbury Storer, chief justice, Phineas Ingalls, William Hasty. Peleg Chandler. and Secomb Jordan, associate justices].[3] the court having, with much deliberation, attended to the subject of the limits of the gaol yard, which was under consideration at their last March term, as is fixed and established by the court of sessions, October term, A. D. 1798, are of opinion, that, inasmuch as the laws relating to imprisonment of debtors have lately been revised by the legislature and undergone a material alteration, that the rights of individuals and the public will be as well secured, and the convenience of the citizens and the public essentially promoted by an extension of the bounds of the gaol yard. It is, therefore ordered, by the court, that from and after the day of passing this order, the bounds of the gaol yard be extended over the whole county, and to the exterior limits thereof; which are hereby fixed and established as the bounds of the gaol yard for the said county of Cumberland. And the clerk of the court is directed to publish the foregoing order, for the information of the citizens of said county, in each of the newspapers printed in the town of Portland. September 14th, 1822.

"Recorded by William T. Vaughan, Clerk."

Mr. Deblois, for defendants, commenced by saying, as preliminary to his argument, if the defendants had committed a breach of the bond, that it was not from intention, but ignorance; and that they had been led into error by the marshal, who, when he committed them, had stated to them, that they were entitled to the same liberties of the yard, as persons committed under process from the state courts.

(1) By the statute of 1784, c. 41 (1 Gen. Laws Mass. p. 177), the court of sessions is authorized to fix the limits of the prison liberties; and by an order of the court of sessions of 1792, they were fixed at the interior limits of the town of Portland. By the act of congress of January 6, 1800, persons imprisoned on process issuing from the courts of the United States, are entitled to the same privileges of the yard or limits of the prison as persons confined on process from the state courts. A breach of the bond cannot be committed while the prisoner remains within the limits. And it is contended, that as the law was in 1800, when the act passed, giving the prison liberties, no distinction was made between night and day; and that a prisoner, who has the liberty of the yard, remains a true prisoner, so long as he does not depart from the interior bounds of the gaol yard. Such is the condition of the bond. The bond itself makes no distinction between night and day; and it is contended that the law does not. To this point he cited the argument of Mr. Story, counsel in Bartlett v. Willis, 3 Mass. 86, and the authorities there referred to; the acts of the legislature of Massachusetts, Jan. 27, 1811; 3 Laws Me. p. 259 (Act Feb. 26, 1822), extending the gaol limits to the limits of the county; Steere v. Field [Case No. 13,350].

---

[3] [From 1 Law Rep. 257.]

(2) When the United States use the state gaols for the confinement of their prisoners, we are to look to the state laws and regulations, to determine what and where the gaol is. If the state enlarges or reduces its prison, it is enlarged or reduced for prisoners confined under the authority of the United States. And if the state should remove the prison from the town of Portland to any other town, and establish her prison limits, the United States prisoners must follow it; and, so long as they remain within the prison, in its new location, there will be no escape. And where the United States allow their prisoners the benefit of the prison rules, they allow them precisely as they are allowed by the state to those confined under the authority of the state. When these liberties are enlarged or contracted by the state for state prisoners, they are enlarged or contracted for those of the United States. Neither the act of 1800, nor any other act of the congress has undertaken to define what the privileges of the yard are, but merely directs, that persons confined under process from their courts, shall have "like privileges of the yard or limits as persons confined on like process from the state courts." This principle is not repugnant to the doctrine of the supreme court, in the cases of Wayman v. Southard, 10 Wheat. [23 U. S.] 1; and U. S. Bank v. Halstead, Id. 51, in which it is decided, that the process acts of the United States adopted the state practice, as it was at the time of the passage of the acts only; and did not adopt, prospectively, changes which the states might afterwards make. The commitment of a debtor on execution is one of the modes of proceeding in a suit; but the mode of detention, after commitment, the greater or less degree of restraint imposed on the prisoner, are left by the United States to the states, with the single condition, that they shall be the same as is practised with respect to persons confined on like process under state authority. Serg. Const. Law (2d Ed.) 169; Reed v. Fullum, 2 Pick. 158; Beers v. Haughton, 9 Pet. [34 U. S.] 331; Randolph v. Donaldson, 9 Cranch [13 U. S.] 76; 3 Pet. [28 U. S.] 220.

(3) If there has been an escape in this case, it is only because the debtors have not been confined within the walls of the prison during the night time. The limits of the prison yard, in 1800, when the act of congress was passed, were the limits of the town of Portland, inclusive of the islands; and it is agreed, that the debtors have not passed beyond these limits. If imprisonment within the prison walls during the night time was not necessary at common law, as it is contended, notwithstanding the decision of Bartlett v. Willis, then, it is clear, there has been no escape. And if the principle contended for is correct, that by the true construction of the act of 1800, connected with the compact by which the United States have the use of the state prisons,

what constitutes the prison and what constitutes imprisonment, or, what it is to remain a true prisoner, is to be determined by the law and practice of each state for the time being, then it is clear there has been no escape.

(4) As a matter of fact, prisoners, committed under process from the United States courts for debt, have not been confined in this state within the walls during the night time, so that if there is an escape in this case, there has been in every case of a commitment for debt. This practice is urged as a proof of the opinion of the profession on the point.

(5) The manner in which persons may be discharged from imprisonment, is entirely regulated by the laws of the United States, and the state insolvent laws are entirely inoperative here. The act of the Maine legislature of 1830, c. 195, abolishes all imprisonment for debt, and all gaol limits, and requires persons arrested for debt to make a disclosure and take the poor debtors' oath in six months, or go into close prison. This, it is contended, is an insolvent law, and cannot apply to debtors arrested under process of the United States courts, and, more especially, debtors of the United States. They can be discharged only in conformity with the act of congress of May 8, 1792, § 1 [1 Stat. 275]. The prison limits for persons committed under the authority of the United States, are now those last established by the state; but whether these, or the limits as they were in 1800, is immaterial to this case. The debtors have not been beyond the limits as established in 1800.

Mr. Howard, U. S. Dist. Atty. The process act of the United States of 1792, governs the proceedings in a suit before the commitment on execution; but the act of 1800 applies after. The process act of 1828, it is contended, is not more extensive in its operation, than the act of 1792. Neither of these acts applies, after a debtor has been committed on execution. Glenn v. Humphreys [Case No. 5,480]; Wayman v. Southard, 10 Wheat. [23 U. S.] 1; Ogden v. Saunders, 12 Wheat. [25 U. S.] 213; Beers v. Haughton, 9 Pet. [34 U. S.] 59. The act of 1800 allows to debtors committed under process from the courts of the United States, the same privileges and liberties of the prison yards as were enjoyed by those committed under process from the state courts at that time. It is contended, that, by the settled law of Massachusetts at that time, a person committed for debt, who had the liberty of the yard, was guilty of an escape by being out of the prison in the night time. The liberty of the yard was allowed only in the day time. Bartlett v. Willis, 3 Mass. 26; Clap v. Cofran, 7 Mass. 98. As it is admitted by the agreed statement of facts, that the debtors in this case have continued at large within the limits during the night as

well as the day time, this disposes of the case, if the principle we contend for is correct.

The relaxations of the laws in favor of imprisoned debtors, introduced by the states subsequent to the passage of the act of 1800, could not be adopted by that act, and they have not been by any act since passed. It is an established principle, that the United States do not adopt the laws or regulations of the states by anticipation. When they adopt them, they adopt them as they exist at the time. This is settled with respect to the process acts. A power is given to the court to vary them so as to confirm the subsequent change in the state practice: but until they are so varied by the courts, they remain unchanged. The thirty-third section of the judiciary act [1 Stat. 91] is not inconsistent with this principle, as that is merely the statement of a principle of universal law, an adoption of the lex loci, which the court would have applied without any legislative enunciation of the principle. Wayman v. Southard, 10 Wheat. [23 U. S.] 1.

It is contended, that the state law for the imprisonment of debtors, as it existed in 1800, continues to be a law for debtors imprisoned on process from the courts of the United States; that every act, which would be an escape, according to the law of the state in 1800, is an escape now notwithstanding any changes since introduced by the state in favor of persons imprisoned under that authority. The United States do not adopt the varying regulations with respect to imprisonment, any more than they do the changes which are made in the course of judicial proceedings.

The process act of 1822 [Laws 1820-23, p. 877] does not apply to proceedings after the debtor is committed. If, however, it be conceded that the rules relating to imprisonment, vary for debtors committed under process from the United States courts according to changing legislation of the state, then the act of the legislature of Maine of 1830, c. 195, will govern this case. That requires the debtor to go into close prison at the end of six months after commitment, unless before that time he takes the poor debtors' oath, or pays the debt. During the six months he is under no restraint, there are no prison limits, and the only gaol for debtors, by this act, is the gaol itself. The prisoner must be within the walls of the prison.

Before STORY, Circuit Justice, and WARE, District Judge.

STORY, Circuit Justice. This cause involves the consideration of some important questions, as to the adoption of the laws of the states in regard to writs of execution, and the right to the gaol liberties by imprisoned debtors, which do not seem hitherto to have undergone any direct adjudication. The principal question is, whether, in the present case, the imprisoned debtors, having obtained the privileges of the gaol yard, by giving the bond in controversy, have been guilty of an escape by being without the walls of the gaol in the night time, although they have always remained by day and night within the limits of the gaol yard. Now, the solution of this question depends mainly upon another. What laws of the state upon the subject of gaol liberties have been adopted by congress to regulate the rights of debtors imprisoned on mesne or final process from the courts of the United States? The argument of the defendants' counsel substantially turns upon this: that the state laws, for the time being, upon the subject of gaol liberties, and the rights of imprisoned debtors, are adopted by congress. The argument of the district attorney, on the other hand, insists, that the act of congress of 1800, c. 4, is the only act regulating the subject, and that adopts the state laws then in force, and none that were subsequently passed. If the argument of the district attorney be well founded, then, as the state of Maine continued to be a part of Massachusetts until March, 1820, the act of Massachusetts of 1784, c. 41, is that, by which the court must be governed on the present occasion; and, indeed, upon any other ground, it is admitted, that the present suit is unmaintainable.

Let us now proceed to a brief survey of the legislation of congress, so far as it touches the present subject. The act of 1789, c. 21, provided, that the forms of writs and executions, except their style and "modes of process," in the courts of the United States, in suits at common law, should be the same, in each state respectively, as were then used or allowed in the supreme courts of the same. The particular words of the act, it having expired, need not be cited. Then came the act of 1792, c. 36, which provided, "that the forms of writs, executions, and other process, except their style, and the forms and modes of proceeding in suits, in those of common law, shall be the same as are now used in the said courts respectively, in pursuance of the act entitled, &c. &c. (the act of 1789, c. 21), except so far as may have been provided for by the act to establish the judicial courts of the United States; subject, however, to such alterations and additions as the said courts respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper from time to time by rule to prescribe to any circuit or district court concerning the same." Three days prior to the passing of this last act, congress, by another act (the act of the 5th of May, 1792, c. 29), provided, "that persons, imprisoned on executions issuing from any court of the United States, for satisfaction of judgments in any civil actions, shall be entitled to like privileges of the yards or limits of the respective gaols, as persons, confin-

ed in such gaols for debt on judgments rendered in the courts of the several states are entitled to, and under the like regulations and restrictions." This act being temporary, was continued for a short period by the act of May, 1794, c. 34; and that was succeeded by another temporary act. the act of May; 1796. c. 38 [1 Stat. 482]; and within a few months after this last act expired, the act of the 4th of January, 1800, c. 4 (which has been alluded to), was passed, and is still in force. That act provided, "that persons imprisoned on process issuing from any court of the United States, as well at the suit of the United States, as at the suit of any person or persons in civil actions, shall be entitled to like privileges of the yards, or limits, of the respective gaols, as persons confined in like cases on process from the courts of the respective states are entitled to, and under the like regulations and restrictions."

There is no other act of congress, which, in terms, refers to the subject of gaol liberties; and it has been contended (as has been already stated) that this is the sole act which does, in fact, regulate the subject, so far as respects the national legislation. If this be so, I should have little difficulty in acceding to another part of the argument, and that is, that the act adopted only the state laws then in force, and did not adopt, prospectively, the future legislation of the states. Hitherto, the judicial construction of the acts of congress, which have adopted state laws, touching writs and processes, and the proceedings thereon, has uniformly been, that they applied to the state laws then in force. To this effect, are the decisions in Wayman v. Southard, 10 Wheat. [23 U. S.] 1, and U. S. Bank v. Halstead, Id. 51; and Beers v. Haughton, 9 Pet. [34 U. S.] 311. I must confess, that I entertain very serious doubts, whether congress does possess a constitutional authority to adopt prospectively state legislation on any given subject; for that, it seems to me, would amount to a delegation of its own legislative power. And I think my doubts strengthened by what fell from the supreme court, on this point, in Wayman v. Southard, 10 Wheat. [23 U. S.] 1, and U. S. Bank v. Halstead, Id. 51. At all events, I should not be disposed to give such a construction to any act of congress, unless it was positively required by its words and its intent; which, it seems to me, cannot be affirmed of the act of 1800.

The difficulty, which I have, is of a very different nature; and that is, whether the act of 1800 alone is applicable to the case of the gaol liberties. But passing by that point for a moment, let us see, how the case would stand upon the Massachusetts act of 1784, c. 41. That act, in the eighth section, provided, "that the courts of the general sessions of the peace shall fix and determine the boundaries of the gaol yards, to the several gaols appertaining, in their respective counties." And in the same section it far-

ther provided, "that any person imprisoned for debt, either upon mesne process or execution, shall be permitted and allowed to have a chamber and lodging in any of the houses or apartments belonging to such prisons, and liberty of the yard within the same, in the day time, but not to pass without the limits of the prison." Now, it is upon the terms of this enactment, that the district attorney rests his case, and contends, upon the authority of decided cases, that it is an escape for a debtor, having the liberty of the yard, to be without the walls of the prison, although he be within the limits of the yard, in the night time. And, in this position, he is fully borne out by the authority of the state courts. The very point has undergone repeated adjudications in the most solemn and formal manner. Bartlett v. Willis, 3 Mass. 86; Baxter v. Taber, 4 Mass. 361; Clap v. Cofran, 7 Mass. 98, 10 Mass. 373; Freeman v. Davis, 7 Mass. 200; Burroughs v. Lowder, 8 Mass. 373; Walter v. Bacon, Id. 468; Patterson v. Philbrook, 9 Mass. 151; Trull v. Wilson, Id. 154.—are directly in point. With these decisions, so far as they profess to decide, that the debtor is not entitled to claim the liberty of the yard, except in the day time, as a matter of right, I entirely accord. But so far as they decide, that the sheriff has no authority, at his own discretion and peril, to allow the debtor the liberty of the yard in the night time, as a matter of favor and not of right, if the question were new, I should be compelled to differ from the learned court. In the case of Steere v. Field [Case No. 13,350], I had occasion, in the state of Rhode Island, fully to express my opinion on this point; and to the opinion then given I deliberately adhere. But I consider the decisions of the state courts, upon the construction of their own statutes, to be conclusive upon the judgment of the courts of the United States; and, therefore, I adopt and follow these decisions, as containing the true interpretation of the Massachusetts statute of 1784, c. 41. And as the act of 1800, c. 4, allows the liberty of the gaol yard "under the like regulations and restrictions" as govern in the state courts, there has been an escape, constituting a breach of the present bond, if the act of 1800 alone gives the rule to this court.

And this leads me to the consideration of another point, which is, whether the act of congress of 1828, c. 68, does not embrace and regulate the right of imprisoned debtors to the gaol liberties. If it does, then it carries down the national legislation, so as to embrace all the state laws in force on the same subject at the time of passing that act. The first section of that act, provides, "that the forms of mesne process. except the style, and the forms and modes of proceeding, in suits in the courts of the United States, held in those states admitted into the Union since the 29th of September, in the year 1789, in those of common law, shall be the same in

each of the said states respectively, as are now used in the highest court of original and general jurisdiction of the same," &c. &c.; subject, however, to such alterations and additions, as the said courts of the United States respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper, from time to time, by rules, to prescribe to any circuit or district court concerning the same. Now, it is to be recollected; that the acts of Massachusetts and Maine, give the privilege of the gaol liberties to debtors imprisoned on mesne process, as well as on execution; and the question might naturally arise, under such circumstances, whether the "forms and modes of proceeding," in suits at common law, referred to in this section, did not include the right of such debtors in Maine to the privilege of gaol liberties. I confess, that I should have great difficulties in holding a different doctrine. But the third section of the act is more directly applicable. It provides, "that writs of execution, and other final process issued on judgments and decrees, rendered in any of the courts of the United States, and the proceedings thereupon, shall be the same, except their style, in each state respectively, as are now used in the courts of such state, &c. &c.; provided, however, that it shall be in the power of the courts, if they see fit in their discretion, so far to alter final process in said courts as to conform the same to any change, which may be adopted by the legislatures of the respective states for the state courts." Now, here we find it expressly provided, that "the proceedings," upon writs of execution and other final process, shall be the same as were at that time used in the state courts. The question, then, arises, whether the allowance of the gaol liberties were not a part of the "proceedings" upon such writs of execution and other final process within the true intent and meaning of the act.

Upon the best consideration I have been able to give the subject, I think it was. It seems to me that all proceedings consequent upon, and incident to such writs of execution and other final process, until the complete satisfaction and discharge thereof, are properly, in the sense of the act, proceedings on the execution or other final process; and that, therefore, the proceedings to obtain the gaol liberties by a debtor imprisoned on such execution, or other final process, are "proceedings thereupon," within the scope and purview of the act. This, it seems to me, is the natural import of the terms used, and a rational exposition of their intention and object. One consideration, which would weigh greatly with me in supporting this construction, is, that, in any other view, no debtor imprisoned on execution in any of the new states, admitted into the Union since the passing of the act of 1800, c. 4, and then constituting a part of the territories of the United States, would have any right to such gaol liberties, however

liberally the privilege may have been granted on mesne or final process by the laws of such new states. I do not know, but I presume, that the general, if not the universal, practice in these states has been, to allow the privilege of the gaol liberties to all imprisoned debtors under the state process; and that the same practice has prevailed in the courts of the United States in those states. And if the fact be, as I presume it to be, the practice in the courts of the United States had a natural foundation and origin in the provisions of the act of 1792, c. 36, which adopted the "modes of proceeding in suits at common law," then existing in the state courts under the state laws; and authorized the courts of the United States, in their discretion, to make alterations and additions thereto; thus opening the means of adopting by express rule or by silent usage the regulations, which might, from time to time, be authorized by the progressive legislation of the states on the same subject. It constitutes no objection to this construction of the act of 1792, c. 36, that there was at that time in existence, a temporary act of congress (act of 1792, c. 29), on the very subject of the gaol liberties; or that there were other acts of the like purport, up to the act of 1800, c. 4. These may be accounted for upon two considerations; first, that they were designed to give a positive right to imprisoned debtors to gaol liberties; and, secondly, as a prevention against any doubt, touching so interesting and humane an object.

But what entirely satisfies my mind on this point, is, that the supreme court of the United States, in the case of Wayman v. Southard, 10 Wheat. [23 U. S.] 35–37, manifestly adopted this very construction of the words "modes of proceeding" in suits at common law, in the act of 1792, c. 36. Mr. Chief Justice Marshall, addressing himself to the question then before the court, whether "proceedings on execution" were within the purview of the words "modes of proceeding in suits at common law," in delivering the opinion of the courts said: The act, passed in 1800, "for the relief of persons imprisoned for debt," takes up a subject, on which every state in the Union had acted, previous to September, 1789. It authorizes the marshal to allow the benefit of prison rules to those, who are in custody under process issued from the courts of the United States, in the same manner, as it is allowed to those, who are imprisoned under process issued from the courts of the respective states. Congress took up this subject in 1792, and provided for it by a temporary law, which was continued from time to time, until the permanent law of 1800. It is the only act, to which the attention of the court has been drawn, that can countenance the opinion, that the legislature did not consider the process act, as regulating the conduct of an officer in the service of executions. It may be supposed, that, in adopting the state laws as furnishing the rule for proceed-

ing in suits at common law, that rule was applicable to writs of capias ad satisfaciendum, as of fieri facias; and that the marshal would be as much bound to allow a prisoner the benefit of the rules under the act of congress, as to sell upon the notice and on the credit prescribed by the state laws. The suggestion is certainly entitled to consideration. But were it true, that the process act would, on a correct construction, adopt the state laws which give to a debtor the benefit of the rules, this single act of superfluous legislation, which might be a precaution, suggested by the delicacy of the subject, by an anxiety to insure such mitigation of the hardships of imprisonment, as the citizens of the respective states were accustomed to see, and to protect the officer from the hazard of liberating the person of an imprisoned debtor, could not countervail the arguments to be drawn from every other law passed in relation to proceedings on executions, and from the omission to pass laws, which would certainly be requisite to direct the conduct of the officer, if a rule was not furnished by the process act. But there is a distinction between the cases sufficient to justify this particular provision. The gaols, in which the prisoners are to be confined, did not belong to the government of the Union, and the privilege of using them was ceded by the several states, under a compact with the United States. The gaolers were state officers, and received prisoners committed under process of the United States, in obedience to the laws of their respective states. Some doubt might reasonably be entertained, how far the process act might be understood to apply to them. The resolutions of congress, under which the use of the state gaols was obtained, "recommended it to the legislatures of the several states, to pass laws, making it expressly the duty of the keepers of their gaols, to receive and safe keep therein all prisoners committed under the authority of the United States, until they shall be discharged by due course of laws thereof." The laws of the states, so far as they have been examined, conform to this resolution. Doubts might well be entertained, of permitting the prisoner, under this resolution, and these laws, to have the benefit of the rules. The removal of such doubts, seems to have been a prudent precaution."

Now, it is observable from the whole current of reasoning in this opinion, that the principal doubt, whether "proceedings" on executions were within the reach of the words, "modes of proceeding" in the act of 1792, c. 36, arose from these very acts on the subject of gaol liberties. And yet the court treated them as merely affirmative, and as prudent precautions. But the doubt in Wayman v. Southard is completely done away by the express words of the act of 1828, "the proceedings thereupon," that is, upon writs of execution, and other final process. And the whole reasoning of the supreme court shows,

that such words would include proceedings by debtors to obtain the gaol liberties. The case of Beers v. Haughton, 9 Pet. [34 U. S.] 329, 359–362, recognises and enforces the same interpretation of the act of 1792. In this last case the court said, "This act (the act of 1828, c. 68), was made after the decisions in Wayman v. Southard, 10 Wheat. [23 U. S.] 1, and Bank of U. S. v. Halstead, Id. 51, and was manifestly intended to confirm the construction given in those cases to the acts of 1789 and 1792; and to continue the like powers in the courts to alter and add to the processes, whether mesne or final, and to regulate the modes of proceeding in writs and upon processes, as had been held to exist under those acts. The language employed seems to have been designed to put at rest all future doubts upon the subject. But the material consideration, now to be taken notice of, is, that the act of 1828 expressly adopts the mesne processes and modes of proceeding in suits at common law then existing in the highest state courts under the state laws, which included all the regulations of the state laws, as to bail and exemptions of the party from arrest and imprisonment. In regard also to writs of execution and other final process, and the proceedings thereupon, it adopts an equally comprehensive language, and declares that they shall be the same as were then used in the courts of the state. Now the words 'the proceedings on the writs of execution and other final process' must from their very import be construed to include all the laws which regulate the rights, duties, and conduct of officers in the service of such process, according to its exigencies, upon the person or property of the execution debtor, and also all exemptions from arrest and imprisonment under such process created by those laws." Now, although some part of this language is addressed to the consideration of the immediate question then before the court, the discharge of bail, upon the ground that the debtor was by the state laws discharged from imprisonment, which laws had been adopted by a rule of the circuit court; yet the general scope of the reasoning is very full to the purposes of the present case. If the words, "the proceedings" on executions, would include exemptions from arrest and imprisonment, they must, a fortiori, include the minor right of mitigating imprisonment by an allowance of the gaol liberties.

If I am right in this interpretation of the act of 1828, then it has, by implication, adopted the act of Maine of the 9th of February, 1822, c. 209, on the subject of gaol liberties. The second section of that act provides, "that the boundaries of the gaol yards, in the several counties in this state, as fixed and determined prior to the 21st day of March, 1821, be and are hereby established, and shall continue until the same or any of them shall be changed by the court of sessions." The fourth section provides, "that whenever any

person. who is or may be imprisoned for debt on mesne process or execution shall give bond to the creditor, with one or more sureties approved, &c., conditioned, that from the time of executing such bond, he will not depart without the exterior bounds of the gaol yard, until lawfully discharged, and if imprisoned on execution, further conditioned, that he will surrender himself to the gaol keeper. and go into close confinement, as is required by law, without requiring any other condition of the bond." The eighth section provides, "that nothing shall be considered a breach of any bond, which has been or may be given to obtain the liberty of the gaol yard, except the passing over and beyond the exterior limits and bounds thereof, as by law established, or neglecting to surrender himself to the gaol keeper as required by the twenty-first section of this act." The twenty-first section provides, "that if any, who may be hereafter imprisoned for debt on execution, shall not within nine months after being first admitted to the liberty of the gaol yard, by giving bond as aforesaid, be discharged according to law. such person shall no longer be entitled to the liberty of the gaol yard; but it shall be the duty of the gaol keeper, from and after the expiration of nine months, to hold such person in close confinement, until lawfully discharged therefrom; and if such person shall not, within three days after the expiration of said nine months, surrender himself to the gaol keeper and go into close confinement, it shall be deemed a breach of the condition of his bond for the liberty of the gaol yard."

These are all the provisions of the statute, which it seems necessary to cite upon the present occasion. In the first place, it is plain from them, that the condition of the present bond does not, either in form or substance, conform to that prescribed by the statute. What may be the legal effect of this departure from the terms prescribed by the statute, I do not pretend to state, except that I may say, that not being a statute bond, the judgment, if any, which may be rendered upon it, must stand upon the common law, and not upon the regulations of the statute.

In the next place, it is as plain, that the statute makes no difference between the day time and the night time, as to the right of the debtor to the full use of the privileges of the gaol yard. On the contrary, it expressly declares, that nothing shall be considered as a breach of the bond, except passing over and beyond the exterior limits and bounds of the gaol yard, or a nonsurrender according to the provisions of the twenty-first section of the statute. In this respect it differs essentially from the Massachusetts act of 1784, c. 41, already cited.

It will make no difference in the present case, that the Maine act of 1822, c. 209, has been changed, or added to, or repealed by any state legislation subsequent to the act of 1828, c. 68. This latter statute having adopted the antecedent state laws, no subsequent change or repeal of those laws has any effect upon the proceedings upon executions, and other final process issuing from the courts of the United States. The proceedings on executions, and other final proceedings. are to be, and remain, exactly, as if the state acts so adopted continued in full force without alteration or addition. This very point was expressly declared in Beers v. Haughton, 9 Pet. [34 U. S.] 329, 363.

The consequence of this view of the case, upon the statement of facts, is, in my judgment, that there has been no escape, by which the present bond has become so forfeited. As the district judge concurs therein, judgment will be rendered for the defendants accordingly.

[The case was taken on a writ of error to the supreme court, where the judgment of this court was affirmed. 14 Pet. (39 U. S.) 301.]